UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEASE AMERICA.ORG, INC. <br><br> Plaintiff, <br><br><br> vs. <br><br> ROWE INTERNATIONAL CORPORATION; AMI ENTERTAINMENT NETWORK, INC.; AMUSEMENT AND MUSIC OPERATORS ASSOCIATION, INC.; DOE DEFENDANTS 1–10 <br><br> Defendants. | CASE NO: <br><br> COMPLAINT FOR DAMAGES FOR VIOLATIONS OF: <br><br> **(1)  SECTION ONE OF THE SHERMAN ACT;** <br> **(2)  UNFAIR BUSINESS PRACTICES UNDER MASSACHUSETTS GENERAL LAW CHAPTER 93A** <br> **(3)  TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS** <br> **(4)  TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS** <br> **(5) TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS** <br> **[DEMAND FOR JURY TRIAL]** |

Plaintiff Lease America.org, Inc. ("Lease America") files this Complaint against Defendants Rowe International Corporation ("Rowe"); AMI Entertainment Network, Inc. ("AMI"); and Amusement and Music Operators Association, Inc. ("AMOA") to secure damages, and demanding trial by jury, claims and alleges as follows:

## INTRODUCTION

1.       This is a paradigm case involving a restraint of trade in an industry that is in a constant struggle to maintain the status quo.  Lease America offered to sell digital jukeboxes in a manner that was more favorable to consumers than the traditional method.  Its business model was a direct threat to the conventional distribution channels that have been standard in the industry for decades.  Lease America's competitors are openly hostile to Lease America's method of doing business, and Defendants AMOA and Rowe worked together in concert to prevent progressive change in the jukebox operator industry.  This suppression would ensure that

the traditional model could remain unrivaled and no one would have to innovate to compete or survive.

2.      The AMOA, backed by the power of strength in numbers, threatened a boycott against Rowe if Rowe continued to supply jukeboxes to Lease America.  Unwilling to risk losing a substantial portion of its customer base and further angering a powerful trade association, Rowe acquiesced to the AMOA and remotely disabled all of Lease America's jukeboxes without any prior notice, providing only vague and pretextual reasons for doing so.

3.      Lease America brings this action seeking redress for violations of Section 1 of the Sherman Act, violations of Section 11 of Chapter 93A of the Massachusetts General Laws, tortious interference with contractual relations, and tortious interference with prospective contractual relations.

## JURISDICTION AND VENUE

4.      This Court has original and exclusive jurisdiction over this civil action pursuant to 15 U.S.C. §§ 15 and 1121 and 28 U.S.C. §§ 1331, 1332, and 1337.  This Court may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this District because Defendants all transact business and can be found within this District within the meaning of 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391.  Further, some of the unlawful acts alleged herein were performed and occurred in material part within this District.

## INTERSTATE COMMERCE

6.      The actions complained of herein have restrained and adversely affected interstate commerce because Defendants sell their products and operate across state lines.  Further, Defendants all purchase goods and supplies integral to the conduct of their business in interstate

commerce.

## THE PARTIES

7.     Plaintiff Lease America is a corporation existing under the laws of Massachusetts, with its principal place of business at 129 Hartford Turnpike, Shrewsbury, Massachusetts 01545.

8.     Defendant Rowe, on information and belief, is a corporation existing under the laws of Delaware, with its principal place of business at 1500 Union Ave., S.E., Grand Rapids, Michigan, 49507.

9.     Defendant AMI, on information and belief, is a corporation existing under the laws of Delaware, with its principal place of business at 155 Rittenhouse Circle, Bristol, Pennsylvania 19007.

10.     Defendant AMOA, on information and belief, is a corporation existing under the laws of Illinois, with its principal place of business at 600 Spring Hill Ring Road, Suite 111, W. Dundee, IL 60118.

## ADDITIONAL UNNAMED CO-CONSPIRATORS

11.     Various persons, firms, corporations, organizations, and other business entities, some unknown and others known, have participated as co-conspirators with the above-named entities in the violations alleged and have performed acts in furtherance of the conspiracy and restraint of trade.  Co-conspirators whose identities are presently known include: Rowe and AMOA.  Additional co-conspirators may be revealed during the course of discovery.

## FACTUAL ALLEGATIONS

### The Jukebox Market

12.     The jukebox industry has changed in recent years.  The majority of new jukeboxes sold in the United States are now digital internet jukeboxes and do not play music

based on records or CDs loaded into the jukebox.  Rather, these new jukeboxes are self-contained and consist of a touchscreen display, a core computer, a storage device, a bill validator, and an amplifier.  The jukebox requires an internet connection and proprietary software (unique to each box's manufacturer) containing key codes that grant access to the jukebox's music selection.  In other words, a jukebox can only play the manufacturer's music, accessed remotely through the internet from a central server, and nothing else.  Digital internet jukeboxes allow the manufacturer to constantly monitor and control every single jukebox it manufactures.

13.     The jukebox industry has a particular and traditional structure where each jukebox ultimately finds a home in a bar, restaurant, or other venue.  The largest and sole remaining significant manufacturers of jukeboxes in the United States are Rowe and Touch Tunes.  Another large manufacturer, Ecast Network, recently shut down operations.  Rowe holds itself out to be the "number one manufacturer" of jukeboxes and has announced that it is a secured creditor of Ecast, so it will presumably become even larger.

14.     Manufacturers then sell jukeboxes to distributors.  Distributors act as a "middle man" between the manufacturers and the operators.

15.     Operators are the jukebox owners, who place jukeboxes in venues for a revenue share and end-user access.  A business that wants to become an operator needs permission from a distributor.  Once an operator has permission, it signs a master operator agreement and it may then put jukeboxes in restaurants and other venues.  Under the traditional model, the venue does not own the jukebox, but it pays a fee to the operator.  Some, or all, of this fee moves back upstream to the manufacturer, who then provides a portion to the distributor.  The operator remains the technical owner of the box.

16.     Many jukebox operators are members of the AMOA.  The AMOA represents the interests of coin machine operators, including jukeboxes.  As phrased in a late 2009 to early 2010 email to its members: the AMOA claims that "To be clear, as the trade group representing the interests of coin machine operators, AMOA condemns any practice that attempts to undermine, threaten or otherwise circumvent the operator community."

**Lease America's Business Method**

17.     Lease America's business method is not new, and it is likely not the first and only victim of an anticompetitive competitive concerted refusal to deal.  Lease America challenged the traditional operator business model.  Rather than merely placing jukeboxes in venues and constantly collecting high fees, Lease America would sell the jukebox directly to the venue. Under Lease America's business model, Lease America would retain no less than a five percent interest in the jukebox, and would collect a monthly fee to cover its ownership interest and other royalty fees.  Selling directly to the venue would grant the jukebox owner greater control over the jukebox and reduce fees paid by venues and end users.  For example, a venue that owned a jukebox could dictate the price a patron paid per song.  Likewise, the venue owner would pay a one-time cost for the jukebox and then would only have to pay Lease America commensurate with the performance of the jukebox.

18.     Lease America had an agreement with Rowe to implement its business model, and demand for Lease America's model quickly increased.  In an email dated July 14, 2008, Mike Maas, an executive with AMI, explicitly agreed to exempt Lease America from certain "click wrap" requirements.  Hoping to avoid angering the operators and distributors that were vociferously opposed to Lease America's business model (and any support Rowe might provide

to Lease America), Mike Maas indicated that "[n]either of us will discuss or disclose this special arrangement with other parties.  If you agree to that I think we can move forward immediately."

**Defendants' Boycott of Lease America**

19.     Although Lease America's business model was popular with customers, it is no secret in the industry that the AMOA opposed the direct selling of jukeboxes.  Jack Kelleher, the AMOA's Executive Vice President, wrote in the AMOA's weekly newsletter on January 7, 2011, *Off the Top*: "Some three years ago, JukesDirect brazenly marketed digital jukeboxes directly to locations and made nary a dent in the industry.  It's just not a model that long-term, holds much promise . . . at least domestically.  To be clear, as the trade group representing the interests of coin machine operators, AMOA condemns any practice that attempts to undermine, threaten or otherwise circumvent the operator community."  As recently as July 2012, the President of the AMOA, Andy Shaffer, stated that he did not "condone" the direct sell model, he did not "believe in it," and the AMOA as an organization did not agree with the direct sell model.

20.     Like JukesDirect (and others), Lease America "brazenly" chose to offer consumers an alternative that might "undermine, threaten, or otherwise circumvent the operator community."  Rather than allowing natural market forces to determine whether Lease America's direct model held long-term domestic promise, the AMOA took matters into its own hands.

21.     At a trade show in Las Vegas, Nevada (the precise date which is unknown but prior to 2009), after Lease America announced its business model, an operator opposed to Lease America's business model stated to Lease America Founder and CEO Charles Pietrewicz that "the hole is already dug for you."  Other operators—that is, Lease America's competitors— complained to Lease America, the AMOA, other trade associations, and Rowe.  After several

operators had complained to the AMOA about Lease America, the AMOA recognized that it

needed to act.  In early 2009, the AMOA held a meeting about Lease America and how to

suppress its growth.  At this meeting, the AMOA's members decided that they would boycott

Rowe if it continued allowing Lease America to sell direct.  A participant at this meeting later

told Mr. Pietrewicz about the occurrence of this meeting, that Lease America was specifically

discussed, and the plan that was hatched.

22.     After this meeting, in late February to early March 2009, the AMOA approached

Rowe and threatened that its operator members would no longer use Rowe jukeboxes if Rowe

continued to allow Lease America to sell its jukeboxes direct.  Unwilling to lose an enormous

share of its customer base, Rowe agreed with the AMOA and its members to boycott Lease

America, and on March 10, 2009, Rowe terminated Lease America's agreement with no advance

notice.  After already granting Lease America an exemption from the new "click wrap"

agreement, AMI's counsel indicated that Lease America had deviated from those terms.  Neither

AMI nor Rowe provided any specification to Lease America.

23.     Because the jukeboxes were controlled from a Rowe central server, the jukeboxes

were simply turned off, and neither Lease America nor the venue's owners were able to access

the content of the jukeboxes rendering them useless.  As such, the venues' patrons were unable

to use the jukeboxes as well.

24.     The AMOA has faced criticism for not being aggressive enough to suppress

direct-sale operators.  One article from *Vending Times*, posted on February 25, 2011, stated:

"These critics ask . . . Where is AMOA now that another direct-sales jukebox scheme has

popped up?"  As such, the AMOA's induced boycott of Lease America was timed with an

AMOA industry trade show.  At this trade show, it was announced that the AMOA had

successfully caused the termination of Lease America—a "direct-sales jukebox scheme."  After shutting Lease America's jukeboxes off, Rowe sent out operators to Lease America's customers to convert the Lease America jukeboxes to new agreements.  These operators informed Lease America's customers that Lease America had been shut down.

25.     Lease America is not the only operator that has been the victim of a boycott. When Ecast (Rowe's former competitor) supported a direct sell program, AMOA New York director Danny Frank sent a scathing letter to the president of Ecast.  This letter broadly hinted that operators would boycott Ecast if it continued to support Power House, a California jukebox operator that had a business model similar to Lease America's.  Likewise, the AMOA stated that "attempts have been made to ratchet up the pressure on the manufacturer [and] content provider [that] is supplying the music to 'cut off' this particular customer."  While Ecast did not succumb to the AMOA pressure (citing a decree it entered into with the U.S. Department of Justice following an investigation into possible antitrust violations), Rowe did.

26.     Rowe's disabling of Lease America's jukeboxes was the killing blow to Lease America's direct sell business model.  The AMOA, acting as a combination of its members, responded to its members' complaints by bullying Rowe—through threats of boycotting Rowe— to eliminate Lease America as a competitor.  The AMOA's threat against Rowe was successful; Lease America was forced out of the market, and consumers were deprived of an alternative choice to the status quo for acquiring or purchasing jukeboxes.

## CLAIMS FOR RELIEF

### CLAIM ONE

### Violation of the Sherman Act, Section 1 (15 U.S.C. § 1)

### (Against all Defendants)

27.     Lease America re-alleges and incorporates by reference the allegations set forth in paragraphs 1–26 of this Complaint.

28.     Section 1 of the Sherman Act (15 U.S.C. § 1) prohibits agreements or arrangements that unreasonably restrain competition to the detriment of consumers.

29.     The AMOA—acting as a combination of its operator members—was opposed to Lease America's method of selling jukeboxes.  On or around late February to early March 2009, the AMOA approached Rowe, Lease America's jukebox manufacturer, and indicated that its operator members intended to stop purchasing jukeboxes from Rowe if it continued to supply Lease America.  On March 10, 2009, agreeing with the AMOA, Rowe simply turned off all of Lease America's jukeboxes.  When Lease America could no longer offer music for the jukeboxes it sold, its other operator competitors took over Lease America's customers.

30.     This direct agreement between the AMOA and Rowe is a brazenly anticompetitive arrangement that impacts consumers' ability to obtain digital jukeboxes under more favorable terms.  The AMOA acted as a combination of its members to incite this boycott, which Rowe acquiesced to.  Given the largely horizontal nature of this boycott and that it is not ancillary to any legitimate business arrangement, the restraint of trade at issue is per se unlawful.

31.     Alternatively, the AMOA's and Rowe's agreement to boycott Lease America is an unreasonable restraint of trade that violates the "Rule of Reason."  The anticompetitive consequences of the boycott, as set forth below, substantially outweigh any procompetitive effects that may stem from the conduct.

32.     The relevant product market for antitrust purposes is digital jukeboxes.  There are no reasonably interchangeable substitutes for digital jukeboxes in terms of price, use, and

quality.  The relevant geographic market is the United States because that is where purchasers of digital jukeboxes purchase these products and that is where the sellers sell them.

33.     The above-described acts of the AMOA, Rowe, and other unnamed co-conspirators have produced antitrust injury and will continue to produce at least the following anticompetitive and injurious effects upon competition in interstate commerce in the United States:

       (a)     competition in the market for digital jukeboxes has been substantially and unreasonably restricted, lessened, foreclosed, and eliminated;

       (b)     consumer choice has been, and will continue to be, limited and constrained as to the manner in which they may acquire digital jukeboxes;

       (c)     consumer access to Lease America (and other) direct-sale jukeboxes has been artificially restricted and reduced;

       (d)     consumers will continue to pay higher prices for digital jukeboxes, with less control over the entertainment in their own venues; and

       (e)     innovation in the way digital jukeboxes can be obtained and operated by consumers has been, and will continue to be, suppressed.

34.     By reason of, and as a direct and proximate result of, Defendants' anticompetitive practices and conduct, Lease America has suffered financial injury to its business and property. As a result, Lease America has been deprived of revenue and profits it would have otherwise made and was effectively driven out of business.  Lease America has not calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when it does so, it will seek leave of the Court to insert the amount of the damages sustained herein.  In the alternative, because Lease America's business has been totally

or partially destroyed by Defendants' violation, Lease America also seeks the "loss of going concern" value of its business.  Lease America has not calculated the precise extent of its loss of going concern value, but estimates its damages to exceed $10 million.

**CLAIM TWO**

**Violation of Chapter 93A of the Massachusetts General Law**

**(Against all Defendants)**

35.     Lease America re-alleges and incorporates by reference the allegations set forth in paragraphs 1–34 of this Complaint.

36.     Defendants are engaged in the conduct of trade and commerce in the Commonwealth of Massachusetts within the meaning of Massachusetts General Law Chapter 93A ("chapter 93A").

37.     Based on all of the above alleged conduct, and other conduct to potentially be revealed during discovery, Defendants violated chapter 93A by engaging in unfair methods of competition and unfair deceptive acts or practices in the jukebox industry within the definition of chapter 93A sections 2 and 11.  These practices are:

(a)     violations of statutory laws, the common law, or other established concepts of unfairness;

(b)     immoral, unethical, oppressive, or unscrupulous; and

(c)     substantially injurious to competitors, other business people, or both.

38.     The acts described herein occurred primarily and substantially within the Commonwealth because Defendants committed injurious acts within the Commonwealth, Lease America is located in the Commonwealth, and Lease America was injured in the Commonwealth.  Lease America developed its business plan in Massachusetts, is incorporated in

Massachusetts, dealt with its jukebox distributor in Massachusetts (Betson New England—located in Massachusetts), paid taxes in Massachusetts, and was put out of business in Massachusetts.  Likewise, when Rowe turned off Lease America's jukeboxes at AMOA's urging, many of these jukeboxes were located in Massachusetts.  In sum, Lease America is located in Massachusetts and claims significant injury in Massachusetts.

39.     By reason of, and as a direct and proximate result of, Defendants' unfair trade practices in the jukebox industry, Lease America has suffered monetary damages and loss of going concern value.  Because Defendants' conduct was willful and malicious, Lease America is entitled to treble damages and attorneys' fees.

## CLAIM THREE

## TORTIOUS INTERFERENCE WITH CONTRACT

### (Against Defendant AMOA)

40.     Lease America re-alleges and incorporates by reference the allegations set forth in paragraphs 1–39 of this Complaint.

41.     Lease America had a contract and business relationship with Rowe.  Lease America's agreement with Rowe stated that when Lease America purchased a jukebox, it could use the jukebox however it wanted as long as any fees were timely paid.  This contract and business relationship had a demonstrable economic benefit to Lease America because Lease America was profiting from its direct jukebox sales, which Rowe approved in a confidential agreement.

42.     AMOA knew of Lease America's business relationship with Rowe, if not the terms of the contract themselves.  At the very least, AMOA knew that Lease America was selling Rowe jukeboxes direct to consumers.

43.     AMOA intentionally interfered with this relationship by stating that its operator members would no longer purchase Rowe jukeboxes if Rowe continued to allow Lease America to sell direct to consumers.  This conduct interfered with Lease America's contract with AMOA because it caused AMOA to turn off all of Lease America's jukeboxes, and Rowe would no longer allow Lease America to sell direct.  AMOA's interference had an improper purpose because it was meant to suppress competition at the operator supply level by putting Lease America out of business.  AMOA's interference was also accomplished through improper means—the threat of a concerted refusal to deal in violation of the Sherman Act and Massachusetts General Laws.

44.     By reason of, and as a direct and proximate result of, AMOA's interference with Lease America's contract with Rowe, Lease America has suffered financial injury to its business and property.  As a result, Lease America has been deprived of revenue and profits it would have otherwise made and was effectively driven out of business.  Lease America has not calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when it does so, it will seek leave of the Court to insert the amount of the damages sustained herein.

45.     The acts described above were done willfully and maliciously with the purpose of putting Lease America out of business or causing crippling injury.  The conduct was done in conscious disregard of Lease America's rights such that an award of punitive or exemplary relief is proper in such sum as the trier of fact deems just.

## CLAIM FOUR

## TORTIOUS INTERFERENCE WITH CONTRACT

### (Against all Defendants)

46.     Lease America re-alleges and incorporates by reference the allegations set forth in paragraphs 1–45 of this Complaint.

47.     Lease America had contracts and business relationships with its customers whose jukeboxes were disabled as a result of Defendants' conduct.  These contracts and business relationships had demonstrable economic benefits to Lease America because Lease America was profiting from its retained ownership percentage in the jukeboxes it sold.

48.     Defendants knew of Lease America's business relationships with its customers, if not the terms of the contracts themselves.  At the very least, Defendants knew that Lease America was selling its customers jukeboxes direct to consumers.  In an April 2009 *Vending Times* article, Lease America was said to have "appeared on the association's [the AMOA] radar."

49.     Defendants intentionally interfered with Lease America's relationship by stating that its operator members would no longer purchase Rowe jukeboxes if Rowe continued to allow Lease America to sell direct to consumers.  This conduct interfered with Lease America's contracts with its customers because the jukeboxes Lease America sold were no longer able to play music—the purpose for which they were purchased.  Defendants' interference had an improper purpose because it was meant to suppress competition at the operator supply level by putting Lease America out of business.  Defendants' interference was also accomplished through improper means—a concerted refusal to deal in violation of the Sherman Act and Massachusetts General Laws.

50.     By reason of, and as a direct and proximate result of, Defendants' interference with Lease America's contracts with its customers, Lease America has suffered financial injury to its business and property.  As a result, Lease America has been deprived of revenue and

profits it would have otherwise made and was effectively driven out of business.  Lease America has not calculated the precise extent of its past damages and cannot now estimate with precision the future damages that continue to accrue, but when it does so, it will seek leave of the Court to insert the amount of the damages sustained herein.

51.     The acts described above were done willfully and maliciously with the purpose of putting Lease America out of business or causing crippling injury.  The conduct was done in conscious disregard of Lease America's rights such that an award of punitive or exemplary relief is proper in such sum as the trier of fact deems just.

### CLAIM FIVE

### TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

### (Against all Defendants)

52.     Lease America re-alleges and incorporates by reference the allegations set forth in paragraphs 1–51 of this Complaint.

53.     Lease America had potential contracts or business relationships with many potential customers who were unsatisfied with their current operators.  These contracts and business relationships had contemplated economic benefits because Lease America was profiting from its retained ownership percentage in all of the jukeboxes it sold.  Before Defendants' conduct, Lease America's business had been growing steadily in its operating years.

54.     Defendants knew of Lease America's potential business relationships because Lease America had already taken business from many other operators by selling direct.

55.     Defendants intentionally interfered with this relationship by stating that its operator members would no longer purchase Rowe jukeboxes if Rowe continued to allow Lease America to sell direct to consumers.  This conduct interfered with Lease America's potential

contracts with new customers because all of Lease America's jukeboxes were disabled, and

Lease America could no longer sell working jukeboxes to new customers interested in Lease

America's direct sell model.  Defendants' interference had an improper purpose because it was

meant to suppress competition at the operator supply level by putting Lease America out of

business.  Defendants' interference was also accomplished through improper means—the threat

of a concerted refusal to deal in violation of the Sherman Act and Massachusetts General Laws.

56.     By reason of, and as a direct and proximate result of, Defendants' interference

with Lease America's potential contracts and business relationships, Lease America has suffered

financial injury to its business and property.  As a result, Lease America has been deprived of

revenue and profits it would have otherwise made and was effectively driven out of business.

Lease America has not calculated the precise extent of its past damages and cannot now estimate

with precision the future damages that continue to accrue, but when it does so, it will seek leave

of the Court to insert the amount of the damages sustained herein.

57.     The acts described above were done willfully and maliciously with the purpose of

putting Lease America out of business or causing crippling injury.  The conduct was done in

conscious disregard of Lease America's rights such that an award of punitive or exemplary relief

is proper in such sum as the trier of fact deems just.

## PRAYER FOR RELIEF

 WHEREFORE, Lease America, Inc. prays for relief against Defendants, and each of them, that

the Court find that:

(a)     Defendants violated Section 1 of the Sherman Act by engaging in conduct

including, but not limited to, a concerted refusal to deal with Lease America in the digital

jukebox industry.

(b)      As a direct and proximate result of this concerted refusal to deal, Lease America has suffered actual damages and loss of going concern value, that are trebled in accordance with Section 4 of the Clayton Act (15 U.S.C. § 15).

(c)      Pursuant to Section 4 of the Clayton Act (15 U.S.C. §15), Lease America be awarded its reasonable attorneys' fees and costs of litigation.

(d)      Defendants violated Massachusetts General Law Chapter 93A, Section 11 by engaging in conduct including, but not limited to, the conduct alleged above.

(e)      As a direct and proximate result of Defendants' unfair trade practices, Lease America has suffered damages and loss of going concern value, that are doubled or trebled in accordance with Massachusetts General Law Chapter 93A, Section 11.

(f)      Pursuant to Massachusetts General Law Chapter 93A, Section 11, Lease America be awarded its reasonable attorneys' fees and costs of litigation.

(g)      AMOA tortiously interfered with Lease America's contract with Rowe with an improper purpose and through improper means.

(h)      As a direct and proximate result of AMOA's tortious interference, Lease America has suffered damages.  Because these actions were done willfully and maliciously, Lease America should be awarded punitive or exemplary relief.

(i)      Defendants tortiously interfered with Lease America's contracts and business relationships with its customers with an improper purpose and through improper means.

(j)      As a direct and proximate result of Defendants' tortious interference, Lease America has suffered damages.  Because these actions were done willfully and maliciously, Lease America should be awarded punitive or exemplary relief.

(k)     Defendants tortiously interfered with Lease America's prospective contracts and business relationships with potential customers with an improper purpose and through improper means.

(l)     As a direct and proximate result of Defendants' tortious interference, Lease America has suffered damages.  Because these actions were done willfully and maliciously, Lease America should be awarded punitive or exemplary relief.

(m)     Lease America should be awarded any and all fair and equitable damages as the Court deems fit.

### DEMAND FOR JURY TRIAL

Lease America hereby demands trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: January 22, 2013                           LEASE AMERICA, INC.

By its attorneys,

_____/s/ Eric B. Goldberg_____          _____/s/ Maxwell M. Blecher_____
Eric B. Goldberg, BBO# 564398              Maxwell M. Blecher (*pro hac vice* pending)
Seegel Lipshutz & Wilchins LLP              Courtney A. Palko (*pro hac vice* pending)
20 William Street, Suite 130                    Jordan L. Ludwig (*pro hac vice* pending)
Wellesley, MA 02481                             Blecher & Collins, P.C.
P: 781.237.4400 / F: 781.235.2333         515 S. Figueroa Street, Suite 1750
egoldberg@slwllp.com                           Los Angeles, CA 90071
                                                          P: 213.622.4222 / F: 213.622.1656
                                                          mblecher@blechercollins.com
                                                          cpalko@blechercollins.com
                                                          jludwig@blechercollins.com