# United States District Court
# District of Massachusetts

| | |
|---|---|
| LEASE AMERICA.ORG, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ROWE INTERNATIONAL CORPORATION; )<br>AMI ENTERTAINMENT NETWORK, INC.; )<br>AMUSEMENT AND MUSIC OPERATORS )<br>ASSOCIATION, INC.; DOE DEFENDANTS )<br>1-10, )<br>)<br>Defendants. )<br>) | **CIVIL ACTION**<br>**No. 13-40015-TSH** |

**MEMORANDUM OF DECISION ON MOTION TO DISMISS BY DEFENDANT AMUSEMENT AND MUSIC OPERATORS ASSOCIATION, INC. (Docket No. 30) AND MOTION TO DISMISS BY DEFENDANTS ROWE INTERNATIONAL CORPORATION AND AMI ENTERTAINMENT NETWORK, INC. (Docket No. 32)**
**March 31, 2014**

HILLMAN, D.J.

## Introduction

The Plaintiff Lease America Org. Inc. ("Lease America") sells electronic juke boxes. Defendants Rowe International Corporation ("Rowe") and AMI Entertainment Network, Inc. ("AMI") manufacture jukeboxes.[1] Defendant Amusement and Music Operators Association, Inc. ("AMOA") is a trade group that represents the interests of jukebox operators. Lease America has brought suit against the defendants seeking monetary damages for their alleged violation of the Sherman Act (Count One), violation of M.G.L. C. 93A (Count Two), tortuous interference with Contract (Count Four), tortuous interference with contractual relations (Count Five). They have

---

[1] AMI files their Motion to Dismiss on behalf on themselves and as successor to Rowe.

brought a separate count against AMOA for tortuous interference with contract (Count Three). All defendants have moved to dismiss all of the above counts. For the reasons set forth below, those motions are granted in part and denied in part.

## Background

Lease America alleges that in 2008 they entered into a secret agreement with Rowe to purchase their jukeboxes. This agreement was secret because it enabled Lease America to sell those jukeboxes directly to end users, which was in contravention of long standing industry practice. According to Lease America, the traditional business model is a convoluted process wherein manufacturers such as Rowe sell their jukeboxes to distributors who act as middlemen between the manufacturers and the operators. It is the operators who own the jukeboxes and ultimately place them in the venues. The venue never owns the jukebox and pays a fee to the operators based upon the jukebox's revenue. A percentage of that fee is remitted to the manufacturer, who in turn pays a portion to the distributor. In order to become an operator, one must agree to the terms of the Master Operator's Agreement and receive permission from a distributor

Lease America's business plan was to sell the jukeboxes directly to the venues while retaining a 5% ownership interest in the boxes, in addition to charging a monthly rental fee to cover its ownership interest and 'other royalty fees.' This rubric, they allege, would result in greater control and reduced costs to the owner. Lease America claims that in 2008 Rowe agreed to sell them jukeboxes with the tacit understanding that Lease America was going to sell directly to the venues and that Lease America was to keep the agreement confidential so that Rowe would not face industry retaliation.

The practice of selling jukeboxes directly to bars, restaurants, and other venues was strongly resisted by AMOA who "condemn(ed) any practice that attempts to undermine, threaten, or otherwise circumvent the operator community."  Inevitably, word that Lease America was selling jukeboxes directly to end users became known.  This resulted in threats to Lease America's president and complaints to AMOA and Rowe.  Ultimately, Lease America alleges, AMOA approached Rowe and threatened that AMOA's members would no longer use Rowe's boxes if Rowe continued to allow Lease America to sell direct.  Based upon those threats, Rowe terminated Lease America's agreement in March of 2009.  The termination of the agreement was accompanied by Rowe "turning off" all of the Lease America jukeboxes that had already been placed in venues from their central server.  This resulted in both Lease America and the venues being unable to access the contents of the turned off jukeboxes.  Ultimately, the Lease America customers were required to convert to the traditional business model.

## Discussion

**AMOA's Motion to Dismiss**

AMOA assigns as grounds for dismissal of Lease America's complaint that:  it fails to state a plausible Sherman Act claim because of its failure to allege direct evidence of an illegal agreement, Lease America's allegations of circumstantial evidence do not plausibly plead an illegal agreement, the complaint fails to exclude the possibility that the defendants acted independently, and the complaint fails to allege an anti-trust injury.  AMOA further argues that the complaint fails to state a plausible C. 93A claim because Lease America failed to allege a conspiracy, that AMOA was not engaged in trade or commerce as required by C. 93A, and that no conduct occurred primarily and substantially in Massachusetts.  Finally, AMOA asserts, and Plaintiff does not contest, that the tortuous interference claims are time barred.

*Does the Complaint fail to state a plausible Sherman Act claim vs. AMOA?*

To state a Sherman Act claim, a plaintiff must allege facts showing some form of an illegal agreement.[2] An illegal agreement may be alleged either through direct or circumstantial evidence or a combination of the two. *White v R.M. Packer Co. Inc*., 635 F.3d 571, 577 (lst Cir. 2011). AMOA points to paragraphs 21 and 22 of the complaint which allege that:

> In 2009, the AMOA held a meeting about Lease America and how to suppress its growth. At this meeting, the AMOA's members decided that they would boycott Rowe if it continued allowing Lease America to sell direct. A participant at this meeting later told Mr. Pietrewicz about the occurrence of this meeting, that Lease America was specifically discussed, and the plan was hatched…
>
> After this meeting, in late February to early March 2009, the AMOA approached Rowe and threatened that its operator members would no longer use Rowe Jukeboxes if Rowe continued to allow Lease America to sell its Jukeboxes direct. Unwilling to lose an enormous share of its customer base, Rowe agreed with the AMOA and its members to boycott Lease America…

AMOA argues that these paragraphs are conclusions cast in the form of factual allegations. I disagree. Paragraphs 21 and 22 allege the following facts:

- AMOA convened a meeting.

- For the express purpose of discussing suppression of the growth of Lease America.

- At that meeting it was decided to boycott Rowe if it continued to allow Lease America to sell direct.

- That this decision was communicated to Rowe shortly thereafter.

- Rowe was threatened with a boycott if they did not agree.

- Rowe agreed with AMOA to boycott Lease America.

There is nothing conclusory about these allegations. They more than make out a plausible claim of direct evidence of an illegal agreement.

---

[2] § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations.""

AMOA points to a series of statements allegedly made by, or on behalf of, AMOA personnel expressing general opposition to the direct-sell model as support for their argument that Lease America's allegations of circumstantial evidence do not plausibly suggest an illegal agreement. These statements, they suggest, do not make the existence of an anti-competitive conspiracy any more plausible and are insufficient to support an alleged Sherman Act violation. As the Supreme Court explained:

> A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief." *Cf. DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (C.A.1 1999) ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, ... but a court is not required to accept such terms as a sufficient basis for a complaint").

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S. Ct. 1955, 1966 (2007).

Here, there is ample circumstantial evidence alleged. Lease America points to the allegations that the jukebox industry is highly concentrated with only two manufacturers dominating the market, that Lease America's business model disrupted the industry status quo, and that trade association conduct cannot be discounted. These allegations taken together with the allegations of direct evidence in paragraphs 21 and 22 sufficiently plead circumstantial evidence of a conspiracy.

*Does the Complaint fail to exclude the possibility that the Defendants acted independently?*

AMOA alleges that Lease America's reliance upon circumstantial evidence of an illegal agreement is deficient unless they offer evidence that tends to exclude the possibility that the

alleged conspirators acted independently. *Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 763 (1984). Because Lease America has alleged direct evidence, in addition to circumstantial evidence of a conspiracy, it is improper at this stage of the proceedings to look beyond those allegations. The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion. "[F]act-specific question[s] cannot be resolved on the pleadings." *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir.2001). A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) *cert. denied*, 133 S. Ct. 846, 184 L. Ed. 2d 655 (U.S. 2013).

*Does the Complaint adequately allege antitrust injury?*

In order successfully to allege injury to competition, a section one claimant may not merely recite the bare legal conclusion that competition has been restrained unreasonably. Rather, a claimant must, at a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail. *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507-08 (9th Cir. 1989). As the First Circuit has made clear:

> Anticompetitive effects, more commonly referred to as 'injury to competition' or 'harm to the competitive process,' are usually measured by a reduction in output and an increase in prices in the relevant market. Injury to competition has also been described more generally in terms of decreased efficiency in the marketplace which negatively impacts consumers. Thus, an action harms the competitive process 'when it obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production methods.'

*Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1096-97 (1st Cir. 1994) (internal citations omitted).

Here, Plaintiff has alleged that competition in the market for digital jukeboxes has been substantially and unreasonably restricted, lessened, foreclosed, and eliminated; consumer choice has been, and will continue to be, limited and constrained as to the manner in which they may acquire digital jukeboxes; consumer access to Lease American and other direct-sale jukeboxes has been artificially restricted and reduced; consumers will pay continue to pay higher prices for jukeboxes with less control over the entertainment in their own venues and innovation in the way of digital jukeboxes can be obtained and operated by consumers will continue to be suppressed. I agree with the AMOA that these allegations are conclusory and recite fundamental antitrust damage principles without factual support. I am accordingly giving Lease America leave to amend its complaint to provide sufficient factual support for their antitrust damage allegations.

*Does the Complaint State a Plausible M.G.L. c. 93A Claim vs. AMOA?*

Count Two of the Plaintiff's Complaint alleges a violation of the Massachusetts Consumer Protection Law, M.G.L. C. 93A, specifically sections 2 and 11. AMOA first argues that they were not engaged in trade or commerce which is a requirement for relief under the C. 93A. "Unfair or deceptive acts or practices . . . can only form the basis of a Chapter 93A claim if those acts are perpetrated in a business context." *St. Paul Fire and marine Ins. Co. v. Ellis and Ellis*, 262 F.3d 53, 66 (1st Cir. 2001). AMOA argues that because they are a non-profit trade association whose primary purpose was to protect the interests of jukebox operators, that they were not involved in trade or commerce. Whether they were, or were not engaged in trade or commerce is a question of fact. *Brown v. Gerstein*, 17 Mass. App. Ct. 558, 570 (1984). Section 1(b) of M.G.L. c. 93A defines "trade" or "commerce" as including "the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property." Lease America notes that nowhere in their complaint do they allege that AMOA is a non-profit

entity. Further, they argue that that status does not disqualify AMOA from liability under the statute.

AMOA also argues that the Complaint fails to allege that their conduct took place "primarily and substantially" within Massachusetts which is required by section 11 of c. 93A. Lease America alleges that it developed their business plan in Massachusetts, is incorporated in Massachusetts, purchased jukeboxes from a distributor in Massachusetts, was put out of business in Massachusetts, and lost many customers in the Commonwealth. This Court agrees with Lease America that this issue is fact intensive. *Hertz Corp. v. Enterprise Rent-a-car Co.*, 557 F.Supp.2d 185, 197 (D. Mass. 2008). Lease America has pled sufficient contacts to survive AMOA's Motion to Dismiss on their Chapter 93A count.

*Are the tortuous interference claims time barred?*

AMOA argues that Plaintiff's tortuous interference with contractual relations claims are all time barred. In Massachusetts, a claim for tortious interference with contractual relations is subject to a three-year statute of limitations. *Lyons v. Gillette*, 882 F. Supp. 2d 217, 235 (D. Mass. 2012) (citing M.G.L. c. 260, §2A). Here, Plaintiff's caused on actions accrued, at the latest, on March 10, 2009, but Plaintiff did not filed these claims until January 22, 2013. Plaintiff does not dispute that these claims are, therefore, time barred, and as such Counts Three, Four, and Five are dismissed.

**Rowe and AMI's Motion to Dismiss**

Rowe and AMI argue, as grounds for dismissal of Lease America's complaint that: Lease America in not the real party in interest and that Lease America is required to sue in Michigan pursuant to a forum selection clause. Rowe and AMI also argue that Lease America's complaint fails to allege a plausible violation of the Sherman Act and fails to allege a plausible violation of

c. 93A. Finally, Rowe and AMI state, and Plaintiff does not contest, that Counts Four and Five should be dismissed because they are time barred

*Is Lease America the real party in interest?*

Rowe and AMI argue that Lease America is not the real party in interest because it is not party to the contract at issue. Rule 17 of the Federal Rules of Civil Procedure requires that "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). The "basic purpose" of this Rule "is to protect a defendant from facing a subsequent similar action brought by one not a party to the present proceeding and to ensure that any action taken to judgment will have its proper effect as res judicata." *Prevor-Mayorsohn Caribbean, Inc. v. P.R. Marine Mgmt., Inc.,* 620 F.2d 1, 4 (1st Cir. 1980). Here, there is no such danger.

The contract at issue was signed by Future Video Inc., a company established by Charles Pietrewicz ("Pietrewicz") in the early 1990s. In April 2007, Pietrewicz incorporated LeaseAmerica.org, Inc. Pietrewicz was the president, CEO, and sole shareholder of both companies. On or before July 2008, Pietrewicz merged Future Video into Lease America. Future Video ceased to exist, and Lease America assumed all of Future Video's rights and obligations. This assignment of rights and obligations from Future Video to Lease America occurred before the conduct at issue in this law suit, and Rowe/AMI were aware of the occurrence: beginning in 2008, Lease America submitted payments to Rowe AMI Entertainment with checks and wire transfers from Lease America's account bearing Lease America's contact information, and corresponded to Rowe/AMI with Lease America's contact information. See *Campus Sweater & Sportswear Co. v. M. B. Kahn Const. Co*., 515 F. Supp. 64, 84-85 (D.S.C. 1979) *aff'd sub nom. Campus Sweater & Sportswear Co. v. M. B. Kahn Const. Co*, 644 F.2d 877 (4th Cir. 1981) (rejecting claim that assignee was not the real party in interest, and noting his assignment took place a year before the trial, leaving defendant with ample time to prepare a defense" that

"defendant was in no way prejudiced by the assignment since all defenses which were available to it against assignor were also available to it against assignee" and that" assignor is effectively precluded from bringing any suit on the [issue] in question, thus insuring that the policies of Rule 17(a) have been protected in this case."). As Future Video no longer exists and Lease America has assumed all of its rights and obligations, Lease America is the real party in interest and can maintain this action against Rowe and AMI.

*Does the forum selection clause require Plaintiff to sue in Michigan?*

Rowe and AMI argue this case must be dismissed because the forum selection clause in section 9(e) of the Master Operator Agreement ("Agreement") requires this action to be filed in Michigan. On a Rule 12(b)(6) the district court may properly consider only facts and documents that are part of or incorporated into the complaint; if matters outside the pleadings are considered, the motion must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment." *Trans–Spec Truck Serv., Inc. v. Caterpillar, Inc*., 524 F.3d 315, 321 (1st Cir. 2008). There is an exception to this general rule for "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint, which courts may properly consider on 12(b)(6) motions." *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009) (internal quotations omitted).

Rowe and AMI's argument is based on a forum selection clause contained in the Agreement, which is not explicitly named or incorporated within Lease America's complaint. The Agreement is first produced by Rowe and AMI as an exhibit to their motion to dismiss. This document cannot be properly considered under Rule 12(b)(6) as it not incorporated into the complaint, and Lease America disputes that the document produced by Defendants represents the

final agreement between the parties. As factual questions as to whether the agreement containing the forum selection clause "was the final "meeting of the minds" between the parties," this Court finds that dismissing this action by enforcing the selection clause would be inappropriate at this time. *Full Spectrum Software, Inc. v. Forte Automation Sys*., Inc., 2012 WL 5875601 (D. Mass. 2012).

*Does the Complaint fail to state a plausible Sherman Act claim vs. ROWE/AMI?*

Rowe and AMI make essentially the same arguments in favor of dismissal of Court One as did AMOA: that Lease America fails to exclude the possibility that the defendants acted independently, and the complaint fails to allege an anti-trust injury. This Court's explanation above applies here as well. Accordingly, Count One will not be dismissed against Rowe and AMI, and Lease America is granted leave America leave to amend its complaint to provide sufficient factual support for their antitrust damage allegations.

*Does the Complaint State a Plausible M.G.L. c. 93A Claim vs. ROWE/AMI?*

Rowe and AMI first argue that the c. 93A cannot be sustained because it relates to the Agreement, which should be governed by Michigan law under the forum selection clause. For the reasons given above relating to the forum selection clause, this Court rejects this argument at this time. Rowe and AMI also argue, as AMOA did, that the c. 93A claim must be dismissed because that the Complaint fails to allege that their conduct took place "primarily and substantially" within Massachusetts which is required by section 11 of c. 93A. As explained above, this is a factual issue that will not be decided on this motion to dismiss.

Finally, Rowe and AMI claim that the Complaint does not contain any facts suggesting the defendants' conduct was "willful and malicious" and is therefore insufficient to state a claim entitling Lease America to punitive damages. Whether the conduct complained of was "willful

and malicious" is a question of fact; Lease America's allegations that Rowe agreed to boycott Lease America, unilaterally terminated its agreement with Lease America and turned off all jukeboxes being used by Lease America customers is enough to move this claim beyond the motion to dismiss stage.

## Conclusion

For the reasons set forth above, AMOA's Motion to Dismiss (Docket No. 30) is **granted** in part and **denied** in part and Rowe and AMI's Motion to Dismiss (Docket No. 32) is **granted** in part and **denied** in part. These motions are **denied** as to Counts One and Two, with Lease America being granted leave to amend in accordance with this decision. Any amended complaint must be filed within 21 days of the date of this order. These motions are **granted** as to Counts Three, Four, and Five.

SO ORDERED.

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**