UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| LEASE AMERICA.ORG, INC., )<br><br>*Plaintiff,* )<br><br>v. )<br><br>ROWE INTERNATIONAL CORPORATION; )<br>AMI ENTERTAINMENT NETWORK, INC.; )<br>AMUSEMENT AND MUSIC OPERATORS )<br>ASSOCIATION, INC.; DOE DEFENDANTS 1-10, )<br><br>*Defendants.* ) | Civil Action No. 4:13-CV-40015-TSH |

**MEMORANDUM IN SUPPORT OF AMI DEFENDANTS' MOTION TO TRANSFER
VENUE AND CONDITIONAL REQUEST FOR LIMITED DISCOVERY
AND EVIDENTIARY HEARING**

May 2, 2014

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS .....................................................................................................2

ARGUMENT ..........................................................................................................................7

I.     A Contractually Valid Forum Selection Clause Mandates Transfer
       Absent Extraordinary Circumstances ........................................................................7

II.    The Master Operator Agreement Governs The Parties' Relationship .......................8

III.   The Master Operator Agreement's Forum Selection Clause Required
       Lease America To Bring This Action In Michigan ....................................................13

       A.     The Forum Selection Clause Is Mandatory ....................................................13

       B.     The Forum Selection Clause Covers All of Lease America's Claims............14

IV.    The Forum Selection Clause Should Be Enforced ....................................................17

CONCLUSION.......................................................................................................................20

CERTIFICATE OF SERVICE ..............................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Akima Corp. v. Satellite Servs., Inc.*, No. COA06–112,
    2006 WL 3719782 (N.C. Ct. App. Dec. 19, 2006) ...................................................14

*Atl. Marine Constr. Co., Inc. v. U.S. Dis. Ct. W.D. Tex.*, 134 S. Ct. 568 (2013) .................. passim

*Bense v. Interstate Battery Sys. Am., Inc.*, 683 F.2d 718 (2d Cir. 1982) ................................16, 17

*Brown v. Press Repair Eng'g Sales & Serv., Inc.*, No. 8:08-CV-1115-T-23TGW,
    2008 WL 5263748 (M.D. Fla. Dec. 17, 2008).........................................................13

*Carter's of New Bedford, Inc. v. Nike, Inc.*, No. 13-11513-DPW,
    2014 WL 1311750 (D. Mass. Mar. 31, 2014)...........................................................18

*CAT Aircraft Leasing, Inc. v. Cessna Aircraft Co.*, 650 F. Supp. 57 (D.V.I. 1986).....................19

*Cullen v. Klein*, No. 291810, 2010 WL 3666758 (Mich. Ct. App. Sept. 21, 2010) .....................15

*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 184 F. Supp. 2d 55
    (D. Mass. 2001), *rev'd on other grounds*, 290 F.3d 42 (1st Cir. 2002)..................................19

*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938) ................................................................8

*Home Prods. Int'l-N. Am., Inc. v. PeopleSoft USA, Inc.*, 201 F.R.D. 42 (D. Mass. 2001).............8

*Huffington v. T.C. Grp., LLC*, 637 F.3d 18 (1st Cir. 2011) ..........................................9, 13, 15, 16

*Huffington v. T.C. Grp., LLC*, 685 F. Supp. 2d 239 (D. Mass. 2010),
    *aff'd*, 637 F.3d 18 (1st Cir. 2011) .........................................................................1

*Jolly v. Faucett*, No. 06-3286, 2007 WL 137833 (E.D. Pa. Jan. 16, 2007)..................................19

*Kehlor Flour Mills Co. v. Linden & Lindstroem*, 230 Mass. 119 (1918) ....................................10

*Kuhlman v. TDP Capital Access, LLC*, No. 291348,
    2010 WL 2793565 (Mich. Ct. App. July 15, 2010)..................................................16

*Lambert v. Kysar*, 983 F.2d 1110 (1st Cir. 1993)............................................................10, 12, 15

*Lanier v. Syncreon Holdings, Ltd.*, No. 11-14780,
    2012 WL 3475680 (E.D. Mich. Aug. 14, 2012).......................................................9

*LeBlanc v. C.R. Eng., Inc.*, 961 F. Supp. 2d 819 (N.D. Tex. 2013)...............................................20

*Martinez v. Bloomberg LP*, 740 F.3d 211 (2d Cir. 2014)..................................................1, 8, 13, 18

*Mead Corp. v. Stevens Cabinets, Inc.*, 938 F. Supp. 87 (D. Mass. 1996)...............................12, 16

*Mendoza v. Microsoft, Inc.*, No. 5:13-CV-378-DAE,
    2014 WL 842929 (W.D. Tex. Mar. 5, 2014) ..........................................................15

*Midamines SPRL Ltd. v. KBC Bank NV*, No. 12 CIV. 8089 RJS,
    2014 WL 1116875 (S.D.N.Y. Mar. 18, 2014) .......................................................20

*New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24 (2d Cir. 1997) .................8

*Nisselson v. Lernout*, No. 03-10843-PBS, 2004 WL 1630492 (D. Mass. July 21, 2004) ..............1

*Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*,
    986 F.2d 607 (1st Cir. 1993) ...........................................................................16

*OsComp Sys., Inc. v. Bakken Exp., LLC*, 930 F. Supp. 2d 261 (D. Mass. 2013)...........................8

*Outek Caribbean Distribs., Inc. v. Echo, Inc.*, 206 F. Supp. 2d 263 (D.P.R. 2002).....................18

*Phillips v. Audio Active Ltd.*, 494 F.3d 378 (2d Cir. 2007) .............................................14, 15, 16

*Pride Int'l, Inc. v. Tesco Corp. (US)*, No. H-12-2889,
    2014 WL 722129 (S.D. Tex. Feb. 24, 2014) .......................................................20

*Provanzano v. Parker View Farm, Inc.*, 827 F. Supp. 2d 53 (D. Mass. 2011)..................... passim

*Pullen Seeds & Soil v. Monsanto Co.*, No. 06-599-SLR,
    2007 WL 2071752 (D. Del. July 18, 2007) ..........................................................17

*Silva v. Encyc. Britannica Inc.*, 239 F.3d 385 (1st Cir. 2001) ...................................................1, 14

*Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 724 N.E.2d 699 (Mass. 2000) ...............................9, 12

*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988)..................................................................7

*Summa Humma Enters., LLC v. Fisher Eng'g*, No. 12–cv–367–LM,
    2013 WL 57042 (D.N.H. Jan. 3, 2013)..............................................................14, 16

*TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370 (S.D.N.Y. 2010) ...........................17

*Turcheck v. Amerifund Fin., Inc.*, 725 N.W.2d 684 (Mich. Ct. App. 2006)..................................14

*Universal Grading Serv. v. eBay, Inc.*, No. 08-CV-3557 (CPS),
    2009 WL 2029796 (E.D.N.Y. June 10, 2009) ....................................................17, 19

*Vickers v. Wells*, No. 105-CV-0930-RWS, 2006 WL 89858 (N.D. Ga. Jan. 11, 2006) ...............15

*Zukas Integrated Mktg. Solutions, LLC v. Captivate Network*, No. 11-13331,
    2011 WL 4889110 (E.D. Mich. Oct. 13, 2011) ......................................................................13

**STATUTES**

28 U.S.C. § 1404(a) ................................................................................ passim

**RULES**

Federal Rule of Civil Procedure 12(b)(3) .......................................................................19

Federal Rule of Civil Procedure 12(b)(6) ...........................................................1, 18, 19

Federal Rule of Civil Procedure 12(g) .........................................................................19

Federal Rule of Civil Procedure 12(h) .........................................................................19

**OTHER AUTHORITIES**

15 Charles Alan Wright, et al., Federal Practice & Procedure § 3844 (4th ed.) ...........................19

5A Mich. Civ. Jur. Contracts § 160 (West 2014) .........................................................14

Contracts § 50 (1981) ................................................................................10

Restatement (Second) of Contracts § 59 (1981) .........................................................9

Restatement (Second) of Contracts § 75 (1981) .......................................................10

Restatement (Second) of Contracts § 223 (1981) .....................................................13

## INTRODUCTION

On March 31, 2014, this Court held that a factual dispute regarding the terms of the contract between Defendant AMI Entertainment Network, Inc. ("AMI") and Plaintiff Lease America.org, Inc. ("Lease America") precluded disposition of AMI's motion to dismiss on forum selection grounds.  Dkt. 51 at 11.  Because a decision in AMI's favor on this threshold issue would deprive this Court of jurisdiction over Lease America's action, and in light of the Supreme Court's recent decision in *Atlantic Marine Construction Co., Inc. v. U.S. District Court W. District Texas*, 134 S. Ct. 568 (2013), AMI respectfully requests transfer of this case to the U.S. District Court for the Western District of Michigan pursuant to 28 U.S.C. § 1404(a).

Unlike Federal Rule of Civil Procedure 12(b)(6), a motion to transfer under § 1404(a) will enable this Court to resolve the evidentiary dispute over the terms of the contract—and thus whether the case belongs in this forum or not—at this stage of the proceedings.  *See Martinez v. Bloomberg LP*, 740 F.3d 211, 216-17 (2d Cir. 2014) (district court is not limited to the pleadings on a motion to transfer but can and should make factual findings to resolve threshold issues).[1]

A court considering a § 1404(a) motion to enforce a contractual forum selection clause must order the transfer absent "extraordinary circumstances unrelated to the convenience of the parties."  *Atlantic Marine*, 134 S. Ct. at 575.  There are no extraordinary circumstances that weigh against transfer here.  Lease America's founder and sole principal, Charles Pietrewicz,

---

[1] AMI originally moved to dismiss under Rule 12(b)(6) because First Circuit precedent indicated that the Rule was the preferred procedural vehicle for enforcing a forum selection clause.  *See, e.g., Silva v. Encyc. Britannica Inc.*, 239 F.3d 385, 387 & n.3 (1st Cir. 2001); *Huffington v. T.C. Grp., LLC*, 685 F. Supp. 2d 239, 240 (D. Mass. 2010), *aff'd*, 637 F.3d 18, 21 (1st Cir. 2011); *Nisselson v. Lernout*, No. 03-10843-PBS, 2004 WL 1630492, at *4 (D. Mass. July 21, 2004).  It was not until after AMI had filed its motion that the Supreme Court clarified in *Atlantic Marine* that § 1404(a) is the most appropriate mechanism for enforcing such a clause.  134 S. Ct. at 579-80.  Lease America relied on this point in response to AMI's notice of supplemental authority.  Dkt. 49, at 2 ("[T]he Court made clear [in *Atlantic Marine*] that the preferred means to enforce a forum selection clause in the federal system should be by a motion under U.S.C. § 1404(a).").

executed AMI's standard Master Operator Agreement ("MOA") on August 31, 2005, which included a forum selection clause providing that any and all disputes "relating to" the MOA are subject to the "exclusive jurisdiction" of the courts of Michigan.  Margold Decl. Ex. 2, MOA § 9(e).  As demonstrated below, the documentary evidence and the parties' course of dealing indisputably establish that (1) in 2005, Future Video, Inc. ("Future Video") entered into a contract with AMI, through its Michigan subsidiary AMI Entertainment, Inc. ("AMI Entertainment"), that included the forum selection clause favoring Michigan; (2) the clause was never subsequently modified or struck; (3) the clause is mandatory; and (4) the scope of the clause covers Lease America's asserted claims.

While AMI believes that the Court can determine these facts based on the evidence provided with the instant motion, if the Court decides that it needs additional evidence to make a definitive ruling, AMI respectfully requests leave to take limited discovery related solely to these issues and, if necessary, an evidentiary hearing on its motion.

## STATEMENT OF FACTS

AMI is a Delaware limited liability company that has its principal place of business in Bristol, Pennsylvania.  Maas Decl. ¶¶ 1-2.  AMI Entertainment, which has its principal place of business in Grand Rapids, Michigan, was a subsidiary of Rowe International Corporation ("Rowe") until 2009, when Rowe merged with Merit Industries, Inc. ("Merit") and changed its name to AMI.  *Id.*  Rowe no longer exists as a corporate entity, although the Rowe brand still appears on some of AMI's products.  *Id.*  AMI moves to transfer venue on behalf of itself and as successor to Rowe.

AMI manufactures digital jukeboxes that provide music entertainment to patrons of "locations," such as bars and restaurants.  *Id.* ¶ 3.  A digital jukebox consists of a computer, a hard drive, a coin and bill acceptor, a display screen, a pre-amp and amplifier, a network security

module, various other electronics, and a cabinet to house them.  *Id.*  In addition to manufacturing and selling the physical jukeboxes, AMI pays substantial royalties to license the music content for its jukeboxes from the major recording studios such as Sony, Warner, Universal/EMI, and other labels.  *Id.* ¶ 5.

AMI uses a multilevel system to distribute its products.  First, it ships the jukebox to one of its regional distributors.  *Id.* ¶ 4.  Similar to a car dealership, these distributors provide valuable services by facilitating the sale and repair of AMI's products.  *Id.*  The distributor then sells the jukebox to a local operator, who negotiates with a location owner to place the jukebox in that location in exchange for a portion of the jukebox's earnings.  *Id.*

The jukebox is not enabled to play music when the operator first purchases it.  This is because AMI's license agreements with the recording studios provide that prior to distributing the music content for the jukeboxes, AMI must require all operators to agree to terms and conditions that will protect the recording studios' rights in the licensed music.  *Id.* ¶¶ 5-6.  AMI therefore requires that before an operator can obtain the music content for its jukeboxes, it must first sign the MOA.  *Id.* ¶ 6.  The MOA grants the operator a sublicense to the music content in exchange for royalties and other protections.  *Id.*  Only after an operator agrees to the terms of the MOA will AMI enable the hard drive for the operator's jukebox and connect it to the AMI Network, thereby allowing the jukebox to access the licensed music content.  *Id.*

AMI also provides its operators with access to an operator website to manage their AMI-powered jukeboxes.  *Id.* ¶ 7.  The first time an operator logs in to the website using its unique ID and password, the screen displays the AMI Network Operation Guide ("Guide") in the form of a "click-wrap" agreement, which states additional terms and conditions governing the operator's relationship with AMI.  *Id.* ¶ 8.  The operator must review the click-wrap and agree

before it can access the operator website.  *Id.*  An operator must contact AMI and provide the

serial number for every jukebox it wishes to connect to the AMI Network.  *Id.* ¶ 9.  AMI then

adds the jukebox to the operator's account so that the operator can manage it via the website.  *Id.*

     In August 2005, Pietrewicz, on behalf of his company Future Video, Inc. ("Future

Video"), sought to become an AMI customer.  Margold Decl. ¶ 2.  Future Video purchased

approximately 11 jukeboxes from Joe Beston of Betson Enterprises, an AMI regional distributor.

*Id.*  In accordance with standard procedures, Pietrewicz was required to agree to the terms of the

MOA.  *Id.*  However, Pietrewicz wanted invoicing and payment terms for his jukeboxes that

were different from those contained in the MOA.  *Id.* ¶ 3.  In response, John Margold, AMI's

Senior VP of Sales, offered to amend the MOA in three respects:  (1) AMI would mail hard copy

invoices to Future Video instead of sending them by email or fax; (2) AMI would accept

payment on the invoices within three days via credit card transaction; and (3) AMI would charge

an additional 2% credit card processing fee.  Margold Decl. Ex. 1, at 1.  Pietrewicz accepted

these terms and signed the MOA and the Guide on August 31, 2005.  *Id.* at 2-6.  Although

Pietrewicz returned only the signature pages, AMI used the same MOA for all of its operators.

Margold Decl. ¶¶ 5-6.  If an operator requested to modify the MOA (which was rare), the

amendment was handled through a "side letter agreement" like the one that Margold sent to

Pietrewicz on August 19, 2005.  *Id.* ¶ 4.  There were no modifications to the MOA other than the

three invoicing and payment terms specified in Margold's letter.  *Id.*

     The MOA contains a "Choice of Law and Venue" provision that states in full:

> This Agreement shall be construed in all respects and for all purposes in
> accordance with the laws of the State of Michigan without giving effect to the
> conflict of laws principles of such State. Each party hereby unconditionally and
> irrevocably consents to the jurisdiction and venue in the Courts of the State of
> Michigan and in the U.S. District Courts for the Northern District of Michigan,
> and irrevocably waives any objection (including any objection with respect to

venue) that any party may now or hereafter have to the exclusive jurisdiction of said courts, and irrevocably consents to the service of process of said courts in any matter relating to this Agreement by the mailing of process by registered or certified mail, postage prepaid, at the addresses specified in this Agreement; provided, that if AMI relocates its offices from its present location in the State of Michigan to a new location, each party hereby unconditionally and irrevocably consents to the exclusive jurisdiction and venue in the Federal and State Courts of the jurisdiction of such new location.  Any award made by a court in conjunction with litigation between the parties regarding this Agreement shall include an award of all reasonable attorneys' fees and cost incurred by the party in whose favor the final decision is rendered.

Margold Decl. Ex. 2, MOA § 9(e).

Once AMI received the executed signature pages from Pietrewicz, the parties proceeded to do business pursuant to the terms of the MOA.  Margold Decl. ¶ 8.  AMI connected seven jukeboxes to Future Video's account in 2005, seven jukeboxes in 2006, and twelve jukeboxes in 2007.  Maas Decl. ¶ 12.  At some point during 2007, Pietrewicz apparently began doing business under the name "Lease America" and ceased doing business under the name "Future Video." Dkt. 35-1 (Pietrewicz Decl. ¶ 5).  Pietrewicz, however, never requested that AMI change the name on his account and continued to use his Future Video account number (#498) when he purchased additional jukeboxes.  Maas Decl. ¶ 11.

The MOA further provides that "AMI may modify this Agreement upon notice to the Operator in the event that AMI determines that such modification is required to comply with terms and conditions required by the licensors of Content."  Margold Decl. Ex. 2, MOA § 9(f). The "Agreement" in this provision incorporates the Guide by reference.  Id. § 1.  In early 2008, AMI updated the Guide by deploying a modified click-wrap agreement to the operator website, which the operator was required to accept before continuing to use the website.  Maas Decl. ¶ 13. Pietrewicz, however, refused to click "I agree," and thus was unable to access the website to manage his jukeboxes.  Id. ¶ 14.  The jukeboxes themselves were unaffected and continued to play music and earn revenue as they had before the click-wrap was deployed.  Id.

5

Pietrewicz contacted Michael Maas, AMI's President and CEO, and requested that AMI remove the updated click-wrap agreement. *Id.* On April 11, 2008, Pietrewicz sent Maas a draft agreement proposing to modify the parties' contracts. Maas Decl. ¶ 14 & Ex. 3. This letter contained several conditions, including a proposed forum selection clause in favor of Massachusetts. Maas Decl. Ex. 3, at 2. While the letter purported to "memorialize" an "agreement" between the parties (*id.* at 1), in fact Maas did not agree to any of the conditions listed in the letter, including the conditions relating to the new click-wrap agreement, when he met with Pietrewicz. Maas Decl. ¶ 14.

In response, Maas informed Pietrewicz in an email sent July 14, 2008 that he was rejecting the invitation to sign the draft agreement. Maas Decl. ¶ 15 & Ex. 4. Instead, Maas offered to "remove the click wrap requirement" and allow Pietrewicz to continue to operate "under the guidelines/contract that was in place just prior to the new click wrap." Maas Decl. Ex. 4. Maas explained that "*what I mean is we'll just go back to the state of things before we did the new click wrap*." *Id.* (emphasis added). By this, Maas meant that in exchange for AMI removing the 2008 click-wrap, both parties would continue operating under the terms of the MOA and Guide that were in place prior to the new click-wrap agreement. Maas Decl. ¶ 15. That same day, Pietrewicz replied to Maas: "I'm in agreement with this mail" and "We are on the same page." Maas Decl. ¶ 16 & Ex. 5. Two days letter, Pietrewicz sent a follow-up reply stating: "Thanks for your response—sounds good and *we are going to rely on your terms below going forward*. *So we have a deal*. I look forward to doing a lot of business with Rowe *on these terms* and thanks for getting back to me." Maas Decl. ¶ 16 & Ex. 6 (emphasis added). Based on this agreement, Maas instructed AMI's employees to electronically bypass the click-wrap that was preventing Pietrewicz from accessing the operator website. Maas Decl. ¶ 16.

6

After this agreement was reached, the parties proceeded to continue to do business under the terms and conditions of the MOA as they had since 2005.  AMI connected five jukeboxes to Future Video's account in 2008 and two jukeboxes during the first quarter of 2009.  *Id.* ¶ 17; Margold Decl. ¶ 8.

## **ARGUMENT**

### I.     **A Contractually Valid Forum Selection Clause Mandates Transfer Absent Extraordinary Circumstances**

In *Atlantic Marine*, the Supreme Court held that "a proper application of § 1404(a) requires that a forum-selection clause be 'given ***controlling weight*** in all but the most exceptional cases.'"  134 S. Ct. at 581 (emphasis added) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988)).  This rule is necessary to protect the parties' bargained-for expectations and further the interests of justice.  *Id.*

Typically, a court considering a § 1404(a) motion weighs various factors related to the parties' private interests and the public interest, and accords extra weight to the plaintiff's choice of forum.  *Id.* at 581 n.6.  But this calculus changes significantly when, as here, the motion to transfer is premised on a forum selection clause.  *Id.* at 581.  First, the plaintiff's choice of forum merits no weight because the plaintiff has already effectively exercised its "venue privilege" by agreeing to a contract containing a forum selection clause.  *Id.* at 581-82.  Second, the Court may not consider any arguments pertaining to private-interest factors such as the convenience of the parties and their witnesses, because the parties have already agreed that the contractually selected forum is convenient.  *Id.* at 582.  Third, the Court may not deny the motion based on countervailing public interest concerns except in unusual cases.  *Id.*  Finally, as the party defying the bargained-for agreement, the plaintiff must bear the burden of convincing the Court that extraordinary circumstances "overwhelmingly disfavor a transfer."  *Id.* at 583.

The *Atlantic Marine* analysis "presupposes a contractually valid forum-selection clause." *Id.* at 581 n.5.  Here, however, the parties dispute whether the forum selection clause in the MOA applies to Lease America's claims.  Therefore the Court must first decide a few threshold matters, namely whether "(1) the parties entered into a valid contract of which the forum selection clause was an agreed-to provision, (2) the clause is mandatory, and (3) the clause governs the claims asserted in the lawsuit."  *Provanzano v. Parker View Farm, Inc.*, 827 F. Supp. 2d 53, 58 (D. Mass. 2011).  If the Court answers each of these questions in the affirmative, then *Atlantic Marine* applies and the clause should be enforced.  *See id.*

To decide these threshold questions, the Court may consider documentary and testimonial evidence in addition to the pleadings.  *See id.* at 56 (considering invoice, letter, and two emails offered by defendants as evidence of the parties' contractual dealings); *see also Martinez*, 740 F.3d at 216-17 (court considering motion to enforce forum selection clause normally relies on pleadings and affidavits, but may order limited discovery and conduct evidentiary hearing); *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 30 (2d Cir. 1997) (district court should have held evidentiary hearing because issue of whether forum selection clause was part of the contract turned on credibility of opposing parties); *OsComp Sys., Inc. v. Bakken Exp., LLC*, 930 F. Supp. 2d 261, 264 n.1, 274-78 (D. Mass. 2013) (deriving statement of facts from complaint and affidavits submitted in support of § 1404(a) motion); *Home Prods. Int'l-N. Am., Inc. v. PeopleSoft USA, Inc.*, 201 F.R.D. 42, 49 (D. Mass. 2001) (considering affidavit as evidence supporting § 1404(a) motion based on forum selection clause).

## II.      The Master Operator Agreement Governs The Parties' Relationship

Massachusetts law governs whether a contract was formed that included the forum selection clause.  *Provanzano*, 827 F. Supp. 2d at 58 (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).  Because the MOA also contains a choice-of-law clause, however, if the Court finds

that a contract was formed, then Michigan law will govern the construction and interpretation of its terms. *See, e.g., Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 20-21 (1st Cir. 2011) (holding Delaware law governed interpretation of forum selection clause where choice of law clause provided that "all terms and provisions" of agreement would be construed under the laws of Delaware); *Lanier v. Syncreon Holdings, Ltd.*, No. 11-14780, 2012 WL 3475680, at *5 (E.D. Mich. Aug. 14, 2012) ("[D]etermining the meaning and scope of a forum selection clause is a separate substantive inquiry that is controlled by the law chosen in the contract itself.").

Under Massachusetts law, a contract is formed if the parties (1) agree on all of the material terms, (2) express their present intention to be bound by the agreement, and (3) exchange sufficient consideration. *Provanzano*, 827 F. Supp. 2d at 58 (citing *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 724 N.E.2d 699, 703 (Mass. 2000)). Here, all of these elements were met in August 2005 when Pietrewicz signed the MOA.

First, the MOA (and the Guide incorporated therein) includes all of the material terms: it identifies the parties, the service and licenses to be provided, and the amount and method of payment. *See, e.g.*, Margold Decl. Ex. 2, MOA §§ 1, 3, 8. Second, the parties manifested their mutual assent to be bound by the MOA. Upon receiving AMI's offer to sign the MOA, Pietrewicz made a counteroffer—he wanted different invoicing and payment terms, as evidenced by the "side letter" from Margold, which formed part of the agreement. Margold Decl. ¶ 3 & Ex. 1; *see also* Restatement (Second) of Contracts § 59 (1981) ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counteroffer."). These were the "conditions" Pietrewicz referred to when he signed the MOA and Guide "with conditions." Margold Decl. Ex. 1, at 3, 5. AMI accepted Pietrewicz's "conditions" and agreed to invoice Future Video by mail, delivery

service, or hand delivery, rather than by fax or email, and to accept credit card payment on those invoices for an additional processing fee.  Margold Decl. Ex. 1, at 1.  There were no other proposed changes to the MOA, and Pietrewicz never raised any concerns with the forum selection clause before signing the MOA in 2005.  *See* Margold Decl. ¶ 4.  Margold's letter requested that Pietrewicz "complete the form included with this letter and return it to us" (Margold Decl. Ex. 1, at 1), which he did.  *See id.* at 2 (completed credit card authorization form).  Although AMI did not return countersigned versions of the MOA to Pietrewicz, Margold's letter and his signature sufficiently conveyed AMI's assent to be bound.  *See Lambert v. Kysar*, 983 F.2d 1110, 1114 (1st Cir. 1993)  (where back of form included place for "approval" by "main office," defendant's status as officer of the company and her signature on front of form reasonably denoted such approval).  Third, valid consideration was exchanged:  the parties gave mutual promises that they would conduct their ongoing business relationship according to the terms of the MOA (and the Guide incorporated therein).  Margold Decl. ¶¶ 3-7 & Exs. 2-3; *see* Restatement (Second) of Contracts § 75 (1981) (exchange of promise for promise is consideration).  In addition, both parties subsequently performed, further confirming their agreement:  AMI connected the jukeboxes to the AMI Network and provided the music content, and Pietrewicz paid royalties to AMI out of each jukebox's earnings.  Margold Decl. ¶ 8; *see* Restatement (Second) of Contracts § 50 (1981) (acceptance by performance manifests assent to the terms of the offer).

Thus, as of 2005, the MOA (and the Guide incorporated therein), as modified by the invoicing and payment conditions, set forth the entire contract.  *See Kehlor Flour Mills Co. v. Linden & Lindstroem*, 230 Mass. 119, 126-27 (1918) (offer to modify only certain terms imports all other provisions of original contract, which are retained on acceptance except as modified).

Lease America cannot contend that no contract was formed in 2005, because that would directly contradict the allegations of the First Amended Complaint. *See, e.g.*, FAC ¶¶ 15, 18, 22 (Dkt. 52). Indeed, the parties always operated under the presumption that a contract existed beginning in 2005. Margold Decl. ¶ 8; Maas Decl. ¶¶ 12, 17. Here, that contract indisputably contains a forum selection clause in favor of Michigan. Margold Decl. Ex. 2, MOA § 9(e).

The forum selection clause in the MOA was never subsequently struck or modified. When AMI proposed an update to the Guide in 2008 (which did not alter the forum selection clause), Pietrewicz refused to accept the modification. Maas Decl. ¶ 14 & Ex. 2. Instead, Pietrewicz's April 11, 2008 letter to Maas was a counteroffer proposing that the parties sign a new contract containing several conditions—one of which was a forum selection clause in favor of Massachusetts. Maas Decl. Ex. 3. AMI did not accept this counteroffer. On the contrary, in Maas's July 14, 2008 email he expressly rejected Pietrewicz's invitation to sign the "draft 'agreement.'" Maas Decl. Ex. 4. Instead, Maas proposed that the parties "***just go back to the state of things before we did the new click wrap***." *Id.* (emphasis added). Pietrewicz accepted this offer twice, when he replied to Maas: "***I'm in agreement with this mail***" and "***we are going to rely on your terms below going forward***. ***So we have a deal***." Maas Decl. Exs. 5 & 6 (emphasis added). As Pietrewicz's April 11, 2008 letter shows, he understood that the new click-wrap was an "amendment to the Master Operator Agreement"—thus, at the time, he was fully aware that withdrawing the "amendment" would leave the MOA in place. Maas Decl. Ex. 3, at 1. That is what Maas offered to do, and what Pietrewicz accepted. Any *ex post facto* attempts to claim otherwise are no more than revisionist history.

These documents unambiguously establish that there was a "meeting of the minds"— both parties agreed that the MOA would continue to govern their relationship on the same terms

as it had since 2005. *See Lambert*, 983 F.2d at 1113 (a counteroffer incorporates all "unamended terms and conditions contained in the original offer, including its venue and choice-of-law clauses"); *Mead Corp. v. Stevens Cabinets, Inc.*, 938 F. Supp. 87, 89 (D. Mass. 1996) ("In Massachusetts, the party who fires the last, unchallenged shot will prevail in a contractual battle of the forms."). *Provanzano*, which involved similar facts, is instructive. There, upon receiving the defendant's form contract containing a forum selection clause, the plaintiff did not strike that provision but handwrote "owner's responsibilities will be governed by Massachusetts law." *Provanzano*, 827 F. Supp. 2d at 59. When defendant received the signed contract, it struck the handwritten proviso. *Id.* The court rejected the plaintiff's argument that this exchange demonstrated that there was no meeting of the minds; rather, it demonstrated that he carefully reviewed the contract and signed anyway. *Id.* This case is even stronger: Pietrewicz knew since 2005 that the MOA contained a forum selection clause in favor of Michigan, yet he did not raise it as one of his "conditions" prior to signing the contract. His inclusion of a forum selection clause favoring Massachusetts in his 2008 proposal also shows that he knew and understood the import of such a provision. Finally, his unequivocal acceptance of the terms of Maas's July 2008 email—when he knew that Maas had not agreed to nor signed the "draft 'agreement'" containing the Massachusetts forum selection clause—demonstrates that he did not consider that provision to be essential to the bargain at the time.

The parties further displayed their mutual assent to be bound by the MOA by continuing their business relationship: Pietrewicz requested, and AMI provided, music content for seven additional jukeboxes in 2008 and 2009. Maas Decl. ¶ 17. AMI performed because it believed that the parties were mutually bound by the MOA. *See id.* ¶¶ 6, 17; Margold Decl. ¶¶ 2, 6, 8; *see also Situation Mgmt.*, 724 N.E.2d at 703 (finding parties created enforceable contract where they

had been doing business together for 15 years, terms of their agreements "had been substantially

the same over the entire course of their business dealings," and plaintiff was well aware that

defendant was relying on the contract with an expectation that the terms would remain the same);

Restatement (Second) of Contracts § 223 (1981) ("A course of dealing is a sequence of previous

conduct between the parties to an agreement which is fairly to be regarded as establishing a

common basis of understanding for interpreting their expressions and other conduct.").

Thus, the forum selection clause contained in the MOA was at all times part of the

parties' agreement.

### III. The Master Operator Agreement's Forum Selection Clause Required Lease America To Bring This Action In Michigan

The forum selection clause in the MOA also satisfies the second and third threshold

requirements identified in *Provanzano*:  it is mandatory, and it covers all of Lease America's

asserted claims in this action.  As noted above, the clause should be construed according to

Michigan law.  *Huffington*, 637 F.3d at 20-21; *accord Martinez*, 740 F.3d at 218, 223-24.

### A. The Forum Selection Clause Is Mandatory

Not only did the parties agree to "unconditionally and irrevocably" consent to jurisdiction

and venue in the courts of Michigan, they agreed to waive "any objection"—including "any

objection with respect to venue"—to the "***exclusive jurisdiction***" of those courts. Margold Decl.

Ex. 2, MOA § 9(e) (emphasis added).[2]  This clause is clearly mandatory.  *See, e.g.*, *Zukas*

*Integrated Mktg. Solutions, LLC v. Captivate Network*, No. 11-13331, 2011 WL 4889110, at *2-

---

[2] Although there is no Northern District of Michigan, this drafting error does not invalidate the forum selection clause because the clause unambiguously provides for venue in the federal and state courts where AMI Entertainment, Inc.'s offices are located. *See, e.g.*, *Brown v. Press Repair Eng'g Sales & Serv., Inc.*, No. 8:08-CV-1115-T-23TGW, 2008 WL 5263748, at *2 (M.D. Fla. Dec. 17, 2008) (holding forum selection clause was not ambiguous because forum was "misnamed" within particular geographic location when only one pertinent forum existed).  Because AMI Entertainment's offices are located in Grand Rapids (Maas Decl. ¶ 1), the appropriate federal court is the U.S. District Court for the Western District of Michigan. *See* http://www.miwd.uscourts.gov/contactus.htm.

3 (E.D. Mich. Oct. 13, 2011) (distinguishing mandatory clauses that provide for "exclusive jurisdiction" from permissive clauses that only identify a possible forum); *Akima Corp. v. Satellite Servs., Inc.*, No. COA06–112, 2006 WL 3719782, at *3 (N.C. Ct. App. Dec. 19, 2006) (applying Michigan law and contrasting permissive use of the word "shall" with mandatory forum selection clauses that use the word "exclusive"); *see also Phillips v. Audio Active Ltd.*, 494 F.3d 378, 386 (2d Cir. 2007) ("A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum or incorporates obligatory venue language."); *Silva*, 239 F.3d at 389 (holding forum selection clause was mandatory where "the word 'must' expresses the parties' intention to make the courts of Illinois the exclusive forum for disputes arising under the contract"); *Summa Humma Enters., LLC v. Fisher Eng'g*, No. 12–cv–367–LM, 2013 WL 57042, at *2, *4 (D.N.H. Jan. 3, 2013) (holding clause stating parties "irrevocably consent and submit to the exclusive jurisdiction of the state and federal courts" of Maine was mandatory).

### B.     The Forum Selection Clause Covers All of Lease America's Claims

The forum selection clause includes within its scope "***any matter relating to this Agreement***."  Margold Decl. Ex. 2, MOA § 9(e) (emphasis added).  In Michigan, the "fundamental rules of contract interpretation" require the court first "to determine the intent of the contracting parties."  *Turcheck v. Amerifund Fin., Inc.*, 725 N.W.2d 684, 687 (Mich. Ct. App. 2006).  Because "an unambiguous contractual provision is reflective of the parties' intent as a matter of law," if the language used is unambiguous the court must "construe and enforce the contract as written."  *Id.* at 688.  Here, the forum selection clause unambiguously applies to "any matter relating to" the MOA (and the Guide incorporated therein).

Under Michigan law, the Court must construe this language according to its "plain and ordinary meaning."  5A Mich. Civ. Jur. Contracts § 160 (West 2014) (citing cases).  The

14

ordinary meaning of "relating to" in a forum selection clause encompasses all claims that bear some connection to the contractual relationship.  *See, e.g.*, *Huffington*, 637 F.3d at 22 ("[C]ourts describe the phrase 'with respect to' as synonymous with the phrases 'with reference to,' 'relating to,' 'in connection with,' and 'associated with,' and they have held such phrases to be broader in scope than the term 'arising out of,' [and] broader than the concept of a causal connection."); *Mendoza v. Microsoft, Inc.*, No. 5:13-CV-378-DAE, 2014 WL 842929, at *10 (W.D. Tex. Mar. 5, 2014) ("Webster's Dictionary defines 'related' simply as 'connected by reason of an established or discoverable relation.'  As the 'related' definition would suggest, *forum-selection clauses covering claims 'relating to' an agreement are broad in scope*." (emphasis added) (citation omitted)); *see also Cullen v. Klein*, No. 291810, 2010 WL 3666758, at *3 (Mich. Ct. App. Sept. 21, 2010) (construing arbitration clause covering "[a]ny dispute or controversy arising out of or relating to this Agreement" as "broad" and "encompassing matters that involve even nonparties to the agreement"); *cf. Phillips*, 494 F.3d at 389 (construing phrase "arise out of" in forum selection clause as more narrow than "relate to," which would encompass "all claims that have some possible relationship with the contract"); *Provanzano*, 827 F. Supp. 2d at 60 (construing forum selection clause purporting to govern only "the agreement" as more narrow than clause covering "all claims relating to this agreement").

All of Lease America's claims relate to the MOA—or, more specifically, to the termination of that agreement.  It does not matter that Lease America did not allege any claims for breach of contract in its First Amended Complaint; indeed, courts have rejected similar attempts to "evade enforcement" of a valid forum selection clause through "'artful pleading.'" *Lambert*, 983 F.2d at 1121 (citation omitted); *see also Vickers v. Wells*, No. 105-CV-0930-RWS, 2006 WL 89858, at *5 (N.D. Ga. Jan. 11, 2006) (finding claims for libel, slander, and punitive

15

damages were "related to" employment agreement and therefore within scope of forum selection clause even though plaintiff did not allege breach of contract claim).

Because Lease America can only show injury by demonstrating that AMI's decision to terminate the MOA violated Section 1 of the Sherman Act or Chapter 93A,[3] these claims are all within the scope of the forum selection clause. *See, e.g.*, *Kuhlman v. TDP Capital Access, LLC*, No. 291348, 2010 WL 2793565, at *3 (Mich. Ct. App. July 15, 2010) (affirming dismissal of claims for misrepresentation, breach of contract, and violation of Michigan Consumer Protection Act based on forum selection clause that applied to "any controversy or litigation arising out of, ***related to***, or regarding the validity or construction of" the parties' agreement (emphasis added)); *see also Huffington*, 637 F.3d at 20-23 (affirming dismissal of claims for misrepresentation and violations of Chapter 93A and Massachusetts Blue Sky Law based on forum selection clause that applied to "any action, suit, or proceeding with respect to" the parties' agreement); *Summa Humma Enters.*, 2013 WL 57042, at *6-8 (finding claims for declaratory judgment, and under state Equipment Dealers Act, Consumer Protection Act, and Antitrust Act were within scope of forum selection clause that covered "any disputes concerning" the parties' contract).

Here, "[t]he contract containing the forum clause [is] the source of the right, duty and injury asserted by the plaintiff." *Phillips*, 494 F.3d at 392 (discussing *Bense v. Interstate Battery Sys. Am., Inc.*, 683 F.2d 718, 720-22 (2d Cir. 1982)). In *Bense*, after a manufacturer of automobile storage batteries terminated its distributor for failing to meet his sales quotas, the distributor sued, alleging that the manufacturer's stated reasons were pretextual and the termination was motivated by anticompetitive purposes. 683 F.2d at 719. Even though the

---

[3] Not only is Lease America's Chapter 93A claim within the scope of the MOA, it is precluded by that contract's choice-of-law clause. *See, e.g.*, *Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607, 609 (1st Cir. 1993); *Mead Corp.*, 938 F. Supp. at 90.

complaint was brought under federal antitrust law, the Second Circuit reasoned that the "gist" of the distributor's claim was that the manufacturer wrongfully terminated the contract. *Id.* at 720. The court therefore held that the distributor's antitrust claims were within the scope of a forum selection clause that applied to "any suits or causes of action arising directly or indirectly from" the parties' agreement. *Id.* Similarly, Lease America can only show injury by demonstrating that AMI's decision to terminate the MOA and disconnect the jukeboxes resulted from a conspiracy between Defendants rather than Lease America's breach. *See, e.g.*, FAC ¶ 2 (alleging that reasons given for termination were "vague and pretextual"). AMI is in an even stronger position than the manufacturer in *Bense* because AMI need only show that Lease America's claims "relate to" rather than "arise under" the Agreement. *Cf. Bense*, 683 F.2d at 720.

Several other courts have similarly held that a forum selection clause covers a plaintiff's antitrust claims. *E.g.*, *TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 378 (S.D.N.Y. 2010) (clause covering all claims "arising out of or relating to" the contract or Google's programs applied to plaintiff's Sherman Act antitrust claims); *Universal Grading Serv. v. eBay, Inc.*, No. 08-CV-3557 (CPS), 2009 WL 2029796, at *14 (E.D.N.Y. June 10, 2009) (clause covering "any claim or controversy at law or equity that arises out of" contract or eBay's services applied to plaintiffs' antitrust and trade libel claims); *Pullen Seeds & Soil v. Monsanto Co.*, No. 06-599-SLR, 2007 WL 2071752, at *1 (D. Del. July 18, 2007) (clause covering "all claims and disputes arising out of or connected in any way" to contract or Monsanto's technologies applied to plaintiffs' antitrust claims). Thus, all of Lease America's claims fall within the scope of the forum selection clause.

## IV.    The Forum Selection Clause Should Be Enforced

Once the Court has determined that a contractually valid forum selection clause covers the claims asserted in the lawsuit, federal law governs the ultimate enforceability of the clause.

*Martinez*, 740 F.3d at 218, 223-24.  Here, that federal law is expressed by the Supreme Court's considered decision in *Atlantic Marine*, which held that a district court should hold the parties to their bargain and grant a § 1404(a) motion to transfer based on a valid forum selection clause absent extraordinary circumstances.  134 S. Ct. at 576, 581.  As the Second Circuit explained, *Atlantic Marine* reaffirms that there is "a strong federal public policy supporting the enforcement of forum selection clauses."  *Martinez*, 740 F.3d at 219.

Any arguments Lease America might raise against transfer are limited to public interest factors such as "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law."  *Atlantic Marine*, 134 S. Ct. at 581 n.6.  Lease America cannot meet its heavy burden to demonstrate that these factors "overwhelmingly disfavor a transfer."  *Id.* at 583.

First, judicial economy counsels in favor of transfer.  Transferring the case at this stage of the litigation will pose the least disruption to the schedule because Defendants have not answered the amended complaint and merits discovery has not commenced.  Immediate transfer would ensure that the bulk of this case is litigated in the forum to which the parties contractually agreed; in contrast, delaying transfer until after discovery and summary judgment motions, for example, would deprive AMI of its bargained-for promise and unnecessarily "disrupt the parties' settled expectations."  *Id.*; *cf. Outek Caribbean Distribs., Inc. v. Echo, Inc.*, 206 F. Supp. 2d 263, 269-70 (D.P.R. 2002) (where discovery period had passed and case was ready to go to trial, potential for delay in final resolution weighed "slightly against" granting motion to transfer). For the same reasons, this Court should rule on the present motion ***before*** addressing Defendants' Rule 12(b)(6) motion to dismiss the First Amended Complaint.  *See Carter's of New*

*Bedford, Inc. v. Nike, Inc.*, No. 13-11513-DPW, 2014 WL 1311750, at \*2 n.3 (D. Mass. Mar. 31, 2014) (stating, where defendant moved to dismiss complaint based on forum selection clause and in the alternative for failure to state a claim, "Because I must address the forum selection issue before I undertake to evaluate the claims themselves, and I conclude this is not the proper forum for this litigation, I do not reach the substance of Carter's claims."); *Universal Grading Serv.*, 2009 WL 2029796, at \*21 (declining to consider defendants' Rule 12(b)(6) motions to dismiss in light of decision to transfer entire action pursuant to § 1404(a)).[4]

Second, Michigan has a greater local interest in this dispute than Massachusetts. The contract was negotiated and performed by AMI from Michigan, and the jukeboxes were connected to, and disconnected from, the AMI Network from there. *See* Margold Decl. ¶¶ 3, 5, 8 & Ex. 1, at 1; Maas Decl. ¶¶ 12, 17. Nor does the First Amended Complaint assert that any of the alleged meetings or contacts between Defendants occurred in Massachusetts. AMOA likewise maintains its principal place of business outside the Commonwealth. FAC ¶ 10.[5] These

---

[4] That AMI followed the First Circuit's guidance in filing its prior Rule 12(b)(6) motion to dismiss does not preclude the relief it seeks here. *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 184 F. Supp. 2d 55, 85 (D. Mass. 2001) ("A defense of improper venue, Fed. R. Civ. P. 12(b)(3) . . . is waived if neither made by motion under Rule 12 nor included in a responsive pleading. A motion to change venue, 28 U.S.C. § 1404(a), on the other hand, need not be made at the first opportunity . . . ." (emphasis omitted) (citation omitted)), *rev'd on other grounds*, 290 F.3d 42 (1st Cir. 2002); *Jolly v. Faucett*, No. 06-3286, 2007 WL 137833, at \*2 (E.D. Pa. Jan. 16, 2007) ("Section 1404(a) motions are not subject to time constraints. Therefore, Plaintiff's waiver argument is specious." (citation omitted)); 15 Charles Alan Wright, et al., Federal Practice & Procedure § 3844 (4th ed.) (A Section 1404(a) motion "is not an objection to venue under Civil Rule 12(b)(3), and thus need not be made in accordance with the provisions of Civil Rules 12(g) and 12(h).").

[5] AMOA's counsel has informed AMI's counsel that it will not oppose this motion and takes no position on whether Michigan or Massachusetts is the appropriate forum for this action. *See CAT Aircraft Leasing, Inc. v. Cessna Aircraft Co.*, 650 F. Supp. 57, 61 (D.V.I. 1986) ("A district court has authority to transfer an entire case rather than to split actions against multiple defendants. . . . Two trials in this matter would be a waste of judicial resources since liability as to both defendants can be easily decided at one hearing. It is in the interest of justice to conserve judicial resources where possible."); *see also Universal Grading Serv.*, 2009 WL 2029796, at \*17 (finding co-defendants were bound by forum selection clause and transferring entire action where all of plaintiffs' claims arose out of same alleged conspiracy between the defendants).

facts weigh in favor of transfer.  *See Pride Int'l, Inc. v. Tesco Corp. (US),* No. H-12-2889, 2014 WL 722129, at *4 (S.D. Tex. Feb. 24, 2014) (plaintiff fails to meet its burden under *Atlantic Marine* where "there is no controversy pending in the present action that is local in nature" and the dispute does not "entail construction of a contract under [local] law"); *LeBlanc v. C.R. Eng., Inc.*, 961 F. Supp. 2d 819, 833 (N.D. Tex. 2013) (this factor weighs in favor of transfer when current forum has no local interest in the dispute aside from being plaintiff's home state).

Third, jurisdiction in this case is not based on diversity of citizenship, and a Michigan court is especially well-suited to apply Michigan law as required by the MOA's choice-of-law provision.  Margold Decl. Ex. 2, MOA § 9(e); *see Midamines SPRL Ltd. v. KBC Bank NV*, No. 12 CIV. 8089 RJS, 2014 WL 1116875, at *7 (S.D.N.Y. Mar. 18, 2014) (choice-of-law provision weighs in favor of transfer under *Atlantic Marine* analysis); *Pride Int'l*, 2014 WL 722129, at *4.

In short, none of the public interest factors can overcome the significant countervailing weight attributed to the parties' chosen forum.  The forum selection clause should be enforced.

## CONCLUSION

For the foregoing reasons, AMI respectfully requests that the Court enforce the Michigan forum selection clause that the parties bargained for and exercise its authority under 28 U.S.C. § 1404(a) to transfer this action to the U.S. District Court for the Western District of Michigan.

May 2, 2014

Respectfully submitted,

ROWE INTERNATIONAL CORPORATION
and AMI ENTERTAINMENT NETWORK, INC.

<table>
<tr><td>

*/s/ David Viens*

David Viens, Esq. (BBO #664281)
David P. Grossi, Esq. (BBO #212920)
BOWDITCH & DEWEY LLP
311 Main Street, P.O. Box 15156
Worcester, MA  01615-0156
(508) 791-3511
dviens@bowditch.com
dgrossi@bowditch.com

</td><td>

*/s/ Elaine Metlin*

Elaine Metlin, Esq., *pro hac vice*
Patricia L. Sindel, Esq., *pro hac vice*
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC  20006-5403
(202) 420-2200
metline@dicksteinshapiro.com
sindelp@dicksteinshapiro.com

</td></tr>
</table>

## **CERTIFICATE OF SERVICE**

I hereby certify that, pursuant to Local Rule 5.4(C), a copy of the foregoing document was served on all counsel of record via the Court's ECF system on May 2, 2014.


*/s/ David Viens*
David Viens